Harvey Brown, Justice
In this negligent nuisance case, Clear Lake Shores residents, Robert and Diana Gulledge, were permanently enjoined from finishing construction of a second-story deck on their boathouse after their neighbors complained that the tall structure would block their water views. The Gulledges appeal, contending that the evidence is legally and factually insufficient to support the negligent nuisance claim and the issued injunction. Alternatively, they argue that the injunction is broader than the pleadings and evidence permitted.
We reverse and render.
*811 Background
Roughly a dozen homes are located on Blue Point Road, a waterfront community in Clear Lake Shores. Blue Point Road is a "unique area" of the Clear Lake channel, where the water is particularly deep and provides direct access to the Gulf of Mexico for large boats headed to sea. Through a licensing process with the State, Blue Point Road residents can construct boathouses in the channel that function as garages for the homeowners' boats. This makes the community attractive to people who own large boats and want to store them in attached boathouses.
There are no other neighborhoods nearby with such deep-water access. One expert testified that it is "very difficult to find water this deep up to a residential lot.... It's a very limited commodity, and it's very valuable." He explained that there are only two places "in the Galveston Bay system" where someone can store 40-feet or longer boats behind their homes. According to the expert, there is "a relationship between the depth of the water and what size boats you might expect people would be able to utilize or berth behind their houses on Blue Point Road." And "if it's a big boat, it's going to require a big boathouse." Another witness testified about the Blue Point subdivision, "You're not limited to the size [boat] that you could bring in."
Thus, the ability to store a large boat at your home rather than at a marina is one of the attractions of the Blue Point Road homes.
There are also aesthetic features that make the neighborhood attractive to homeowners. To varying degrees, community residents have views of the channel, Seabrook Shipyard, and the nearby Kemah bridge. From their properties, they can watch local boat parades and "very busy" passing boat traffic entering and exiting the channel.
The Blue Point Road homeowners are bound by various community restrictions, including a restriction that home structures cannot be placed within five feet of the property lines or the waterline, but there are no community or city restrictions regarding the height of residents' boathouses. The view of the channel and other features is impacted by the size and design of neighboring boathouses. Many are close to 20 feet tall, and at least one is 25 feet tall.[2] They have varying lengths to accommodate the boats being stored, and one boathouse is 81 feet long. Some boathouses have an open design, while others are enclosed. Without community restrictions, Blue Point Road residents do not have complete control over their water views. The size and type of boathouse their neighbors might choose to construct has the potential to diminish their water views.
The homes on Blue Point Drive run north-south. The channel is to the east of the homes. In 2011, Robert Gulledge and Diana Gulledge bought a home between the homes of Warren Wester and Theodore Sullivan. These homes, relative to one another, are shown on the diagram attached as Appendix I.
These residential lots are relatively narrow; most are 50 feet wide but Sullivan's is 70 feet wide. Like many of their neighbors, the Gulledges had a boathouse, which held a 40-foot boat. In 2015, they bought a larger, 55-foot Azimut yacht and decided to construct a larger boathouse to store it. Their design called for a 60-feet long and 20-feet wide boathouse with a height of 25 feet above mean tide. This height was necessary *812 to provide sufficient clearance for the Azimut.[3]
The Gulledges submitted a construction application to the State's General Land Office. This was required because the community's boathouses are not located on private lands; they are located on land owned by the State of Texas. The General Land Office approves plans and grants a coastal easement that leases the State's submerged land for a boathouse location. The GLO reviews a proposed boathouse's footprint but not its height. Thus, the GLO reviews a boathouse's length into the channel for navigation purposes but does not review its aesthetic impact. As part of the permitting process, GLO notified the Gulledges' neighbors of the Gulledges' application and offered an opportunity to object.
Sullivan objected to the proposed boathouse's original location, asserting that it was too close to his property line and made access to his boathouse more difficult. After meeting with the GLO and Sullivan, the Gulledges agreed to move their proposed boathouse closer to the Wester property to the south and to knock down their existing boathouse, which was only two years old at the time. Sullivan agreed to withdraw his objection.
After they submitted their original construction plans, the Gulledges noticed that some other boathouses in Galveston County (but not in the immediate Blue Point Road area) had covered rooftop decks. Robert Gulledge testified that a deck on top of their boathouse would provide an area to socialize with family and friends and a clearer view of the boats coming down the channel. The Gulledges revised their plans to include a deck 25 feet above the water level, with an aluminum-covered roof at least 10 feet above the deck.[4] The second story, like the first, would not be enclosed, but it would have a spiral staircase, side railings, "minimal" lighting, diagonal braces, and a small cargo lift without sides. The roof over the 1200-square-feet deck would be supported by piers, and the new height of the boathouse would be 39.5 feet instead of the original 25-feet height.
Wester and Sullivan objected to the redesign, asserting that the open-sided second story would block their view of the waterway. They testified that they had no objection to a boathouse that was comparable in height to their own-around 17 feet high-or even to the Gulledges' original 25-feet high design. The GLO informed Wester and Sullivan that it does not regulate boathouse height.[5] The GLO approved the Gulledges' boathouse footprint and construction began.
After the Gulledges obtained the GLO's authorization and began the boathouse construction, Wester and Sullivan initiated the underlying suit, asserting claims for intentional private nuisance, negligent private nuisance, and invasion of privacy. Wester and Sullivan focused their suit on and limited their request for injunctive relief to the open-sided second story.
At trial, Wester and Sullivan each testified-and photographs confirm-that the second story deck allows its occupants to *813 look down into their backyards. Additionally, Wester testified about some adverse health effects he attributed to the presence of the oversized boathouse, including higher blood pressure.
Wester and Sullivan testified that the Gulledges' boathouse was significantly larger than any other in the area. Wester and Sullivan also presented testimony from two other residents who agreed that the Gulledges' boathouse was unlike the others in the neighborhood. One testified that, if the Gulledges had built that boathouse next to his property, he would have moved. The other testified that the Gulledges' boathouse blocked his water view as well. A local realtor testified that the Gulledges' boathouse would decrease the value of Wester's and Sullivan's properties because of the diminished view, but he did not quantify the difference in value. He also testified that it would be harder to sell Wester's and Sullivan's properties because the Gulledges' boathouse was "out of character."
The Gulledges presented counter testimony from two neighbors who said they were not bothered by the Gulledges' boathouse. They also presented the testimony of another realtor, who testified that the Gulledges' boathouse would add value of the neighborhood properties by showing prospective buyers the potential to build larger boathouses in the community.
Wester and Sullivan each testified that the Gulledges' proposed open-sided second story of their boathouse blocked the water view from their property. Without siding, the second story only blocks the water view to the extent its component features obstruct the neighbors' views. These include railing, diagonal braces, a staircase leading to the second-story deck, a proposed copper roof and gutter in the upper portion of the two-story structure, and vertical piers to support the nearly 40-feet tall structure. Wester and Sullivan do not allege that the lower portion of the Gulledges' boathouse is a nuisance; therefore, the extent to which a docked boat would obstruct their water view would be irrelevant to the analysis of their negligent nuisance claim.
It is undisputed that each Blue Point Road resident's view is blocked to varying degrees by their neighbors' boathouses and other design features. The Sullivan's boathouse is 17 feet tall and has solid-wood siding; therefore, it completely blocks the Gulledges' north-eastern view for the first 17 feet above water level. Jed Gulledge, who is Robert Gulledge's brother, owns land in the community and has a boathouse that is roughly 26 feet tall and 60 feet long. Another neighbor, Williams Keys, has a boathouse that is roughly 81 feet long. And, to the extent some of the boathouses are not enclosed, when their owners have their boats docked, their neighbors' views are obstructed by the docked boats. Moreover, the Gulledges' yacht is not the only large boat in the neighborhood; at least two other homeowners have yachts.
Additional view obstruction is caused by landscaping choices. For example, Sullivan has a number of trees and extensive vegetation on his land that partially obstruct the Gulledges' view.
Still more potential view obstruction may result from the homes themselves. The community restrictions permit residents to build two-story homes as close as five feet from their neighbor's property line and the waterline. A two-story house[6] that is five feet from the waterline would *814 partially obstruct the water views from the neighboring properties.
These visual obstructions, however, are less significant from the vantage of the second stories of these homes. All three homeowners involved in this suit-the Gulledges, Sullivan, and Wester-have two-story homes, and their second stories are roughly 17 feet high and have large windows to provide a view of the channel. According to Robert Gulledge, each owner can see passing ships and the Kemah bridge from their second stories even when his yacht is parked in the boathouse because of the difference between his boat height (21.5 feet) and the deck floor (25 feet) and because of the absence of siding on his boathouse.
The jury found that the Gulledges did not intentionally cause a nuisance and that the boathouse did not invade Wester and Sullivan's privacy. The jury did find the Gulledges liable for negligent nuisance, but it awarded them no past damages. After trial, the trial court rendered a judgment for negligent nuisance, including a permanent injunction. The permanent injunction limited the roof height of the Gulledges' boathouse to 25 feet above mean high tide and prohibited use of the deck for social gatherings.
Standard of Review
In a legal-sufficiency review, the court determines whether reasonable and fair-minded people could arrive at the factfinder's conclusion, after considering all evidence that supports the verdict and disregarding contrary evidence unless a reasonable factfinder could not. City of Keller v. Wilson , 168 S.W.3d 802, 827 (Tex. 2005). We will conclude that the evidence is legally insufficient to support the finding only if (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. Id. at 810. We review the evidence in the light most favorable to the judgment. Id. at 822.
Negligent Nuisance
In their first issue, the Gulledges challenge the legal sufficiency of the evidence supporting the negligent nuisance claim.
A. Definition of nuisance
The Texas Supreme Court recently undertook the task of clarifying private nuisance law. See Crosstex N. Tex. Pipeline, L.P. v. Gardiner , 505 S.W.3d 580 (Tex. 2016). The Court explained that the law of "nuisance" seeks to balance a property owner's right to use his property "as he chooses in any lawful way" against his duty not to use it in a way that injures another. Id. at 590-91 (citing Gulf, Colo. & Santa Fe Ry. Co. v. Oakes , 94 Tex. 155, 58 S.W. 999, 1000 (1900) ). With that principle in mind, the Court defined "nuisance" as "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." Id. at 593 (quoting Holubec v. Brandenberger , 111 S.W.3d 32, 37 (Tex. 2003) ).
According to the Crosstex Court, a nuisance does not refer to a cause of action "but instead to the particular type of legal injury that can support a claim or cause of action seeking legal relief." Id. at 594 (emphasis in original). "The law of nuisance recognizes that certain injuries to a person's right to the 'use and enjoyment of property' " can constitute a "form of legal injury for which a legal remedy will be granted." Id. at 595.
*815 The Court explained that "the condition the defendant causes may interfere with a wide variety of the plaintiffs' interests in the use and enjoyment of their property. It may, for example, cause physical damage to the plaintiffs' property, economic harm to the property's market value, harm to the plaintiffs' health, or psychological harm to the plaintiffs' 'peace of mind' in the use and enjoyment of their property." Id. at 596. In fact, the Court explained, "virtually any disturbance of the enjoyment of the property may amount to a nuisance." Id. at 597 (quoting Prosser, 3d ed. § 90, at 6113).
But, importantly here, to rise to the level of nuisance, the interference must satisfy two other requirements: it must (1) be "substantial" in light of all the circumstances and (2) cause "discomfort or annoyance" that is objectively "unreasonable." Id. at 595.[7]
The first limitation-the substantiality requirement-"sets a minimum threshold that confirms that the law 'does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbances of every day life in a civilized community even from conduct committed with knowledge that annoyance and inconvenience will result.' " Id. at 595 (quoting Prosser and Keeton § 88, at 626). The Court emphasized that foul odors, dust, noise, and bright lights must be "sufficiently extreme" to constitute a nuisance. Id. at 595 n.8.[8] In determining whether the interference is substantial, a court may review whether the use impairs the adjoining property's market value. Id. The substantiality test is fact-specific and includes, "for example, the nature and extent of the interference, and how long the interference lasts or how often it recurs." Id. at 595-96.
The second limitation is that the "discomfort or annoyance" must be objectively unreasonable, i.e., that ' "the harm resulting from the invasion is severe and greater than the other should be required to bear without compensation." Id. at 596 (quoting Restatement (Second) of Torts § 829A ).[9] The Court emphasized that the unreasonableness inquiry focuses on the conduct's effect, not the conduct itself, id. at 596-99 ; that the test is an objective one that views the effect from the standpoint of a "person of ordinary sensibilities," id. at 596, 599-600 ; and "as is typical with legal inquiries into reasonableness," that "the determination requires balancing a wide variety of factors, depending on the specific facts." Id. at 596 ; see id. at 601 ("To establish a cause of action for which the law provides a right to relief, ... there *816 must not only be an injury or loss but it must have been occasioned by the commission of a legal wrong, that is, violation of legal right and a breach of legal duty." (internal quotations omitted) ).
Finally, the Court set forth a liability standard of care. Id. at 604. There are three classifications for private nuisance: intentional nuisance, negligent nuisance, and strict-liability nuisance. Id. at 602, 604-609. A negligent nuisance "claim is governed by ordinary negligence principles." Id. at 607. Accordingly, Wester and Sullivan were required to prove that the Gulledges owed them a duty, they breached the duty, and Wester and Sullivan suffered damages as a proximate cause of the breach. See id. In addition, Wester and Sullivan had to prove that the Gulledges' "negligent conduct caused a nuisance, which in turn resulted in [Wester's and Sullivan's] damages." Id. In a negligent-nuisance case, "a nuisance may result from 'a failure to take precautions against a risk apparent to a reasonable man.' " Id. (quoting Prosser 3d ed. § 88, at 596).
B. Wester and Sullivan did not show a substantial interference that unreasonably affects their use and enjoyment of their property
The Gulledges contend that a view impairment cannot support a nuisance claim. On the other hand, Wester and Sullivan maintain that Crosstex left the issue of whether a nuisance exists to the jury. Id. at 609 (observing that questions of whether interference with use and enjoyment of property is "substantial" or "the effects of such an interference on the plaintiffs are unreasonable" are generally "questions of fact for the jury to decide").[10]
We conclude that it is unnecessary for us to determine whether Texas law, post- Crosstex, erects a bright-line barrier against all view-impairment nuisance claims because there is legally insufficient evidence of a substantial inference that unreasonably affects Wester's and Sullivan's use and enjoyment of their land. Id. at 609 ("A court may decide the issues as a matter of law only if the underlying facts are undisputed or, in light of all the evidence, 'reasonable minds cannot differ.' "). While the witnesses differ in their conclusions about the impact of the Gulledges' boathouse, the photographs show the extent of the visual impairment and the testimony regarding the neighborhood features and building restrictions, as well as the other landowners' relative conduct, is conclusive. We turn to applying the facts to the Crosstex factors for measuring the interference impact of the open-sided second story of the Gulledges' boathouse.
First, we examine "the nature of the interference." Id. at 595. The Gulledges' proposed second-story deck causes no invasion onto Wester's or Sullivan's property. Unlike cases where light, odor, or smoke invade an adjoining property, the effect of the Gulledges' proposed deck construction was not on the plaintiffs' land itself. Even if view impairment could potentially have economic or psychological effects, the plaintiffs, here, did not present any expert testimony quantifying any economic harm. And the jury, in its response to the damages jury question, rejected a psychological harm claim: it found that the plaintiffs did not suffer any "damages for annoyance or discomfort, caused by a nuisance that impairs the use and enjoyment of real property."
*817 Second, we consider "the character and nature of the neighborhood, each party's land usage, and social expectations" as well as "the extent to which others in the vicinity are engaging in similar conduct." Id. at 600. These factors underscore that the record presents no substantial and unreasonable interference. The unique characteristics of the subdivision and the channel show that the use of large boathouses (which impair water views) is not unexpected. There were no deed restrictions, city regulations, or GLO provisions that regulated boathouses' size. The subdivision landowners purchased their homes with knowledge that city regulations permitted homes to be built higher than the Gulledge's boathouse and as close as five feet from the water, which would create an even larger visual impairment than the Gulledges' proposed open-sided second-story deck on their boathouse.
Wester and Sullivan knew that the channel was deep and led to Galveston Bay, making it a prime location for yachts. Indeed, they purchased their properties, in part, so they could watch parades of yachts and other boats. And if any of these landowners owned and temporarily docked a yacht outside their home, the moored yacht would block the adjoining neighbor's view of the channel. If the yacht owner wanted to store the yacht adjacent to their own property, as Wester and Sullivan do with their boats, the yacht owner would need a comparatively large boathouse to store it. Indeed, Wester and Sullivan have boats and boathouses that would be viewed by many as large. And other landowners have yachts even longer than the Gulledges'.
The boathouses are the one constant feature for all neighboring homes, and they all, to some extent, block some neighbor's view. Thus, social expectations were that homeowners could purchase lots with the plan to store yachts there in their accompanying boathouses, which would block neighbors' views to varying degrees.
The vegetation, particularly tall trees, creates additional visual obstructions. And the narrow lot size and resulting density and close proximity of the homes and the boathouses creates even more visual obstructions. As noted, Wester and Sullivan do not challenge these visual obstructions to their view. They instead challenge only the open-sided second story of the Gulledges' boathouse.
The "defendant's motive" is another factor for determining whether any interference is substantial or its effects unreasonable. Id. Here, the jury rejected the claim of intentional interference. And the undisputed evidence showed that the Gulledges took some steps to minimize the interference. First, they moved the boathouse to accommodate Sullivan. Then, they intentionally decided not to erect wooden siding so as to minimize the boathouse's visual impairment. Next, they selected other features to minimize the visual obstruction caused by the second story, such as the type of rails, cargo elevator, and staircase. Short of not erecting a cover over or hand rails for a second-story deck, Wester and Sullivan have not identified anything that could have been done to minimize the visual obstruction created by the proposed second-story deck.
Finally, we examine the extent of the interference and how long it lasts or how often it reoccurs. Id. at 595-96. Regardless of its height, the Gulledges' boathouse does not impair Wester's and Sullivan's view looking immediately east to the ship channel from their land. It does, however, impair their view if they look to the direction where the Gulledges' boathouse stands (i.e., if Wester looks to the northeast and Sullivan looks to the southeast). But the obstruction created by the Gulledges'
*818 boathouse's second story is only partial; while impaired, photographs show that residents can see through the open-sided second story of the boathouse. In contrast, the Sullivan's boathouse obstructs the view for the first 17 feet even more than the Gulledges' boathouse because its sides are covered with solid wood, while the Gulledges' boathouse has no siding. The Gulledges' boathouse is a partial-not total-visual obstruction.
Bob Randall, the architect who designed the boathouses for Wester, Sullivan, and the Gulledges, described the visual impact of the Gulledges' boathouse's features: he described the deck as "two floating planes supported by wood structure piles that are 70 feet long. Architecturally the roof plane and the deck plane are separate. And approximately 80 percent of that side area is open so that one can view through the structure. It does not have a mansard roof or an appendage hanging down or wall-type that restricts the view corridor."
Wester and Sullivan argue that, because they presented multiple people in the neighborhood to testify that the Gulledges' boathouse would disturb their sensibilities, they have presented sufficient evidence in support of this element of their negligent nuisance action.[11] But this argument overlooks the Crosstex Court's holding that, to rise to the level of a nuisance, the effect of the defendant's conduct must substantially interfere with and unreasonably affect the use and enjoyment of property. We conclude that these two requirements are not satisfied on this record, as a matter of law, given that the second story is open with only the supporting structural beams and the narrow deck and roof-line planes obstructing the views. Considering the parties' reasonable expectations and the already present view impairment that is unchallenged in this suit, this record presents legally insufficient evidence that the second story of the boathouse caused a substantial interference that unreasonably affected what Wester and Sullivan could and should have expected. Thus, the evidence is legally insufficient to support the judgment against the Gulledges for negligent nuisance and the related injunction.
Wester and Sullivan counter that their evidence meets the low threshold of "more than a scintilla of evidence" supporting their claim, thereby precluding a reversal and rendering of judgment on legal-sufficiency grounds. They point to various witnesses' testimony, including certified residential *819 broker, Raymond Hooker, who testified that the completed boathouse would have a "pretty substantial" negative effect on their property values.[12]
But the standard of review for legal sufficiency does not permit a party to insulate a favorable judgment by pointing to some favorable evidence and ignoring all other evidence that provides needed context. See City of Keller , 168 S.W.3d at 811-12 (discussing contextual evidence in legal-sufficiency review and stating that, "if evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded even if that means rendering judgment contrary to the jury's verdict").
When contrary evidence allows only one logical conclusion, jurors are not free to reach a verdict contrary to that evidence. Id. at 814 ; see id. at 810-11 (stating that, in legal-sufficiency review, contrary evidence should not be ignored if that contrary evidence conclusively establishes opposite result). This rule applies equally in the nuisance context. See Crosstex , 505 S.W.3d at 609 (stating that courts may decide issues of substantial interference and its objectively unreasonable effect as matter of law if underlying facts are undisputed or if reasonable minds could not differ). In fact, contrary evidence most often becomes "conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied." City of Keller , 168 S.W.3d at 815.
Here, the record includes both photographs that conclusively establish the degree of view impairment and testimony that conclusively establishes the minimal restrictions on construction and design up to five feet from the water's edge. This evidence is conclusive even though witness testimony characterized the view impairment as significant. See id. at 815 (stating that evidence is conclusive "if reasonable people could not differ in their conclusions," while noting that "conclusive evidence may or may not be undisputed"). While there was not a complete absence of evidence on which Wester and Sullivan had the burden of proof, the evidence was legally insufficient on the issues of the substantiality of the interference and the objective reasonableness of its effects because, as a matter of law, the visual impairment did not meet the required thresholds for those elements in light of the narrow nuisance claim (limited to the boathouse's open-sided, second story deck and not including the first story boat storage area), the undisputed testimony describing the second-story deck's intended features and the limited degree to which they add visual impairment, the construction photographs, and the scope and extent of the neighborhood's building restrictions that permit construction of two-story structures within five feet of the water's edge and also permit boathouses and dense vegetation (all of which add to visual impairment for neighbors' water views). See id. at 820 (stating that jury is "not free to believe testimony that is conclusively negated by undisputed facts"); see also Neyland v. Schneider , 615 S.W.2d 285, 286-87 (Tex. Civ. App.-Eastland 1981, no writ) (affirming judgment as matter of law for defendant on nuisance claim because, as matter of law, unreasonableness *820 standard not met); cf. United Food and Commercial Workers Int'l Union v. Wal-Mart Stores, Inc. , No. 02-15-00374-CV, 2016 WL 6277370, at *7 (Tex. App.-Fort Worth Oct. 27, 2016, pet. denied) (mem. op.) (affirming summary judgment for plaintiff because elements of its nuisance claim, including substantiality and unreasonableness, were established as matter of law).
Because reasonable minds could not differ on the conclusion that the interference met neither the substantiality nor the objective reasonableness threshold to support Wester and Sullivan's negligent nuisance claim, we sustain the Gulledges' first issue.[13]
Conclusion
We reverse the trial court's judgment on Wester's and Sullivan's negligent nuisance claim and render a take nothing judgment against Wester and Sullivan. The Court has unanimously voted to deny the motion for en banc reconsideration.[14]

According to a boathouse architect, the average heights vary from 14 to 28 feet. He has never designed a boathouse larger than 34 feet tall.

The yacht is over 20 feet tall, sleeps six people, and has three cabins and a small kitchen.

The proposed deck's rooftop would have a 3-feet 6-inches high peak. According to expert testimony from an architect, if the roof was removed but the deck remained, a guardrail would still be required under applicable building codes.

The GLO did, however, charge the Gulledges an additional fee for their boathouse's second story, which is the agency's custom because of the risk of increased debris in the water after a storm.

Jed Gulledge has a home on Blue Point Road that is 55 feet above the normal tide of channel.

The Court explained, for instance, that "while noises or odors from a horse stable might occasionally or minimally 'interfere' with the enjoyment of neighboring land, they can create a nuisance only if the stable is 'so kept, or so used, as to destroy the comfort of persons owning and occupying adjoining premises, and impair their value.' " Similarly, noting that "gunpowder must be stored somewhere," the Court stated that gunpowder's "storage can create a nuisance when it is a 'constant source of apprehension and alarm,' prevents the plaintiffs from renting their land 'at any price,' and substantially reduces the land's market value." Crosstex N. Tex. Pipeline, L.P. v. Gardiner , 505 S.W.3d 580, 595 (Tex. 2016).

The Court quoted but added an emphasis to its 2004 opinion in Schneider National Carriers, Inc. v. Bates , 147 S.W.3d 264, 269 (Tex. 2004), holding modified on other grounds , Gilbert Wheeler, Inc. v. Enbridge Pipelines (East Texas), L.P. , 449 S.W.3d 474 (Tex. 2014). See ids="6901969" index="20" url="https://cite.case.law/sw3d/449/474/">id. at 595 n.8 ("There is no question that foul odors, dust, noise, and bright lights-if sufficiently extreme -may constitute a nuisance.").

The Court also described the nuisance created by a horse stable as "destroy[ing] the comfort of persons owning and occupying adjoining premises, and impair[ing] their value." Id. at 595.

See id. at 600 (stating that "determination of whether a defendant's interference with a plaintiff's use and enjoyment of land is substantial or whether any particular effect of that interference is unreasonable requires consideration and balancing of a multitude of factors.").

Wester and Sullivan also argue their negligent nuisance claim is supported by the manner in which the Gulledges obtained permits from the GLO and the Army Corps. Wester and Sullivan recognize that the GLO and Army Corps do not regulate the height of structures that extend into the water. Yet they argue that the boathouse "was non-compliant with the plans originally approved" because the ultimate height was greater than the originally-proposed height. Wester and Sullivan argue in their brief that "the evidence at trial was that the only permit the Gulledges ever received ... did not authorize any construction over 25 feet. This alone would support the jury's finding of negligence." There are a number of problems with this argument. They cite no authority in support of their assertion. It is inconsistent with their concession elsewhere in their brief that the GLO and Army Corps do not regulate the height of structures. They brought a negligent nuisance claim, not a general negligence claim, and the jury was instructed on negligent nuisance. And they provide no explanation for how they have standing to complain about the permitting process.
Likewise, they argue that "the Gulledges did not notify the neighbors of the additional height added to the boathouse" without establishing that the Gulledges had any obligation to notify them of such or how this led to any legal injury. These arguments do not change the nature and character of the neighborhood or the nature and character of the interference to support a negligent nuisance claim.

Hooker did not effectively limit his negative views of the structure to the aspect Wester and Sullivan claimed to be a nuisance, i.e., the second-story deck. For example, Hooker testified that the Gulledges' boathouse, once completed, would block the neighbors' views of the "whole end of that channel" once "a boat [is] put in there." Yet Wester and Sullivan explicitly excluded any view impairment caused by the lower portion of the boathouse from their nuisance claim.

Because it would not result in greater relief, we do not reach the Gulledges' remaining two issues concerning the factual sufficiency of the evidence and the scope of the injunction. See Tex. R. App. P. 47.1.

The en banc court consists of Chief Justice Radack and Justices Jennings, Keyes, Higley, Bland, Brown, Lloyd, and Caughey. Justice Massengale, not sitting.